UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRADLEY HEPPNER,<br><br>Defendant. | **SEALED INDICTMENT**<br><br>25 Cr.<br><br>25 CRIM 503 |

## COUNT ONE
### (Securities Fraud)

The Grand Jury charges:

1. BRADLEY HEPPNER, the defendant, engaged in a fraudulent scheme to loot more than $150 million from GWG Holdings, Inc. ("GWG"), a publicly traded company for which he served as chairman. HEPPNER accomplished his scheme by extracting GWG's funds through a series of misrepresentations about, and self-serving transactions with, Highland Consolidated Limited Partnership ("HCLP"). Though HEPPNER repeatedly described HCLP as an independent entity, it was, in fact, a shell company controlled by HEPPNER and operated for his benefit.

2. In order to obtain a payout for himself, BRADLEY HEPPNER, the defendant, created a $141 million debt owed to HCLP from his private company, Beneficient. Over time, HEPPNER gained control and influence over GWG. HEPPNER then made false and misleading statements to a special committee of GWG's board of directors to induce them to authorize investments by GWG in Beneficient, so Beneficient could make payments on the debt purportedly owed to HCLP. When the special committee inquired about who controlled HCLP, HEPPNER represented that HCLP was independent, disclaimed influence over it, and denied that he would personally receive the payments on the purported debt. Those representations were false and

misleading. HCLP was controlled by HEPPNER. And when GWG authorized payments to satisfy what it believed were arm's length debts owed to a third-party lender, those funds flowed through multiple corporate entities and ultimately to HEPPNER's personal accounts.

3. As a result of this scheme, BRADLEY HEPPNER, the defendant, received more than $150 million in GWG assets in the form of payments on the debt to HCLP, which he controlled. HEPPNER used these funds for personal expenses, including to fund his lifestyle and to renovate his Dallas mansion. Once HEPPNER exhausted his ability to siphon GWG's assets for himself, he separated himself from GWG. GWG filed for bankruptcy shortly thereafter, causing losses exceeding $1 billion to thousands of investors and bondholders.

## HEPPNER's Takeover of GWG

4. GWG was a Nasdaq-listed financial services company that historically operated in the secondary life insurance business. GWG raised capital through bonds—called L Bonds—sold to retail investors, predominantly retirees seeking income-generating investments. During the relevant period, GWG raised over $1 billion from thousands of investors.

5. In 2018, GWG took an equity interest in Beneficient Company Group, L.P. and affiliated entities ("Beneficient"), a financial services startup founded and controlled by BRADLEY HEPPNER, the defendant. Beneficient's stated business model involved offering investors in illiquid investments the opportunity to cash out, or monetize, their illiquid alternative assets, such as private equity interests. The business model required substantial capital to acquire the alternative assets. The company, however, was undercapitalized, unable to obtain outside investments, and suffering persistent operating losses. Through GWG's investment, Beneficient received a much-needed cash infusion, and GWG was able to diversify its sources for future earnings.

6.  In or about April 2019, BRADLEY HEPPNER, the defendant, directed the acquisition of the ownership interests of GWG's founding shareholders, effectively giving him control over GWG. With this power, HEPPNER installed himself as the chairman of GWG's board of directors and appointed his friend and associates as GWG's new board members and CEO. This transaction tightened Beneficient's already close relationship with GWG. HEPPNER began concurrently serving as GWG's chairman and Beneficient's chairman and CEO, and nearly every other member of GWG's board also simultaneously served as a member of Beneficient's board. Because of the large overlap between GWG's and Beneficient's boards, GWG's board created a special committee, made up of independent members, to approve transactions between Beneficient and GWG. Among other things, GWG advertised the independence of the special committee in the materials the company distributed to retail bond investors. The transactions approved by the special committee included additional equity investments in Beneficient or capital infusions to cover a massive debt on Beneficient's balance sheet.

### The Beneficient Debt

7.  When GWG took an equity interest in Beneficient, and later consolidated with the company, there was a $141 million debt on Beneficient's books that BRADLEY HEPPNER, the defendant, described as a loan from an independent third party that had provided the money to start Beneficient.

8.  Unbeknownst to GWG's special committee, this debt was not a conventional loan from a third-party lender that helped get Beneficient up and running. Instead, the debt originated when BRADLEY HEPPNER, the defendant, directed an employee to tally up old, informal payments that HEPPNER had made out of HCLP. Those payments were for a range of different ventures—only one of which was Beneficient—along with tens of millions spent on HEPPNER's

3

personal expenses, such as the purchase of his 1,500-acre ranch in East Texas. HEPPNER directed his employee to classify these expenditures as debt Beneficient owed HCLP. Then HEPPNER made the debt appear like a formal loan by having an HCLP subsidiary enter into an agreement with Beneficient to provide a $141 million loan to refinance Beneficient's debt. That refinancing did not involve the transfer of any money, but it left the appearance that Beneficient had a large, formal debt owed to an outside lender.

9. The creation of this debt owed to a purported third party provided BRADLEY HEPPNER, the defendant, with a mechanism to extract money from Beneficient ahead of all other stakeholders. Under Beneficient's capital structure, HCLP's debt held senior priority over all other obligations. Beneficient therefore was purportedly required to pay HCLP before satisfying any other claims—before other lenders, equity investors, or any other party.

10. BRADLEY HEPPNER, the defendant, understood that the existence of more than $140 million in senior debt on Beneficient's balance sheet would raise questions with investors and other counterparties, particularly if that debt was owed to him. Indeed, in or about 2014, when HEPPNER first attempted to market Beneficient to investors, the large amount of debt on the company's books and the connection to HEPPNER was poorly received. So HEPPNER concocted a story to tell investors and other counterparties: the debt came from an independent third-party family that had made a seed investment in Beneficient, and that repayment would go to that family's trust.

11. BRADLEY HEPPNER, the defendant, tried out this misleading story on two prospective investors. Over the course of 2018, HEPPNER solicited investments in Beneficient from two investment firms, both of which questioned him about whether he controlled HCLP or would benefit from repayment of the debt. HEPPNER provided misleading information about his

control over, and the extent to which he would benefit from repayments on, the debt, but ultimately both investors decided not to invest.

12.     BRADLEY HEPPNER, the defendant, then turned to trying to raise money from GWG, for Beneficient to pay down his debt. HEPPNER recognized that GWG had the ability to raise large amounts of money by selling L Bonds. He also knew that GWG's large equity investment—and, by April 2019, his significant influence over the company—put him in a strong position to deceive GWG into making further investments in Beneficient that HEPPNER could use to pay down the debt.

### Misrepresentations to GWG's Special Committees to Induce Payments

13.     Between in or about May 2019 and March 2021, BRADLEY HEPPNER, the defendant, both directly and through others, repeatedly deceived GWG's special committee into approving the transfer of approximately $300 million from GWG to Beneficient, much of which Beneficient used to meet its supposed debt obligations. To induce those payments, HEPPNER informed GWG's board that Beneficient's lender, HCLP, was demanding payment and threatening foreclosure on Beneficient's assets. When GWG's special committee members inquired about HEPPNER's relationship with HCLP. Heppner and others acting at his direction gave false and misleading answers—misrepresenting who controlled it, denying his ability to influence its decisions, and concealing that funds transferred to HCLP as debt payments would ultimately go to HEPPNER. HEPPNER also took affirmative steps to obscure his control, including by fabricating and backdating documents and appointing his friends as purportedly independent managers to create the appearance of HCLP's independence. For example:

  a.     In or about May 2019, within weeks of assuming control of GWG, HEPPNER caused a $65 million transfer of funds from GWG to Beneficient. To induce the transfer

of funds to Beneficient, HEPPNER informed GWG's board that Beneficient required an immediate capital infusion. Before the special committee authorized that transfer, HEPPNER—both directly and through others—misled members of that special committee and their representatives to believe that HCLP constituted an independent third-party lender. HEPPNER also caused the special committee to receive materials showing that HCLP had an independent manager that directed its operations and was capable of making demands of Beneficient. In reality, the purportedly independent manager was HEPPNER's longtime friend who secretly operated HCLP pursuant to HEPPNER's directions. Based on those representations, the special committee, operating under the belief that HCLP constituted an independent third-party lender, authorized a $65 million unsecured loan to Beneficient. Beneficient transferred millions of these funds to HCLP.

    b.  After the GWG special committee authorized the $65 million loan to Beneficient, several members of the GWG and Beneficient boards expressed concerns to HEPPNER that GWG's money was going to service the debt, rather than to expand Beneficient's business, as had been intended. These board members requested more information about the debt. In response, understanding that the longstanding personal relationship between HCLP's purported independent manager and HEPPNER could intensify questions concerning HCLP's independence, HEPPNER arranged for a former business associate to take over the role of managing HCLP, at least on paper. As with HCLP's prior manager, however, HEPPNER did not give up control and instead told the new manager that the role would be limited to signing off on paperwork at the direction of HEPPNER. HEPPNER also backdated documents to create the false appearance that the management change had occurred months earlier, before the substantial transfers from GWG had commenced. Then, with the assistance of others, HEPPNER prepared a letter for a committee

of Beneficient's board that falsely represented that HEPPNER had no control over HCLP and the debt; that most of payments would go to the third-party family's trust; and that HEPPNER had only a minimal possibility of receiving any payments from the debt.

   c. In late 2019, HEPPNER sought an additional $79 million from GWG, this time structured as an equity investment in Beneficient. Of that amount, nearly $50 million was designated for immediate transfer to pay down the HCLP debt. In advance of that transaction, HEPPNER—both directly and through others—misrepresented to the GWG special committee that HEPPNER would not receive repayments on the debt and had an arm's length relationship with the new manager of HCLP, who supposedly directed the entity's operations. HEPPNER also claimed, through others, that the newly installed manager had demanded that HCLP receive a $50 million payment to waive a default provision under the debt. In reality, the new manager had been installed by HEPPNER only weeks earlier and was acting at HEPPNER's direction.

   d. In 2020, again at HEPPNER's urging, the GWG special committee approved a $61 million investment in Beneficient, approximately $28 million of which was for debt payment. In advance of that transaction, HEPPNER misled the special committee by claiming that HCLP and its related entities would put Beneficient into default due to a missed loan payment, unless GWG injected enough funds for Beneficient to make a significant payment on the debt. As in the past, HEPPNER gave the misimpression that these demands originated with HCLP's supposedly independent third-party manager—when, in reality, the demands originated with HEPPNER.

   e. Between in or about July 2020 and March 2021, GWG made additional investments in Beneficient, often without consulting the special committee. Beneficient continued to use large portions of those funds to pay down the debt. Throughout this period, HEPPNER

maintained the false impression that HCLP operated as an independent third-party lender. He also concealed from GWG's board the fact that funds transferred to HCLP flowed to his personal accounts and entities.

14. Of the hundreds of millions of dollars that GWG transferred to Beneficient, Beneficient paid more than $150 million to HCLP in purported principal, interest, and fees. Those funds did not remain with HCLP. They flowed through HCLP to several entities and trusts under the control of BRADLEY HEPPNER, the defendant. In total, HEPPNER received more than $150 million through payments on the purported debt. HEPPNER used these funds for a variety of expenses, including for more than $40 million for renovations and decorations in HEPPNER's mansion; more than $10 million for upkeep, expansion, and various IT services at HEPPNER's ranch and mansion; more than $10 million for personal credit card and private air travel expenses; roughly $20 million to cover tax expenses; and more than $500,000 on jewelry.

15. While BRADLEY HEPPNER, the defendant, extracted over $150 million, GWG collapsed. The company filed for Chapter 11 bankruptcy in April 2022, unable to satisfy more than $1 billion in obligations to more than 15,000 L-bond investors. Those losses fell primarily on retail investors, many of them retirees who had invested their savings based on representations that L-bonds constituted safe, income-generating investments.

### Heppner's Lies to Auditors

16. As a public company, GWG was required to comply with the federal securities laws designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public. Pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, GWG was required to file with the United States Securities and Exchange Commission ("SEC") quarterly and annual financial statements, and

maintain books and records that accurately and fairly reflected GWG's business transactions. To comply with the federal securities law, GWG was also required to have its annual financial statements audited by independent certified public accountants.

17. Because by the end of 2018, GWG held a large interest in Beneficient, Beneficient's audit was required to be incorporated in GWG's 2018 annual SEC filing. Beneficient retained an independent auditor to assist in preparing its audit. As part of the audit, it was necessary for Beneficient's auditor to consider whether HCLP was independent of BRADLEY HEPPNER, the defendant, and Beneficient, and whether one of the people HEPPNER had installed to run trusts associated with Beneficient was also independent. Neither of those was true, so HEPPNER made false and misleading statements and prepared false documents to deceive the auditor, including to disguise the fact that HEPPNER controlled HCLP and the Beneficient-associated trusts.

18. Specifically, with respect to HCLP, BRADLEY HEPPNER, the defendant, represented that since 2017, an independent third party had been managing the entity. That was misleading, at best, because for years, HEPPNER had been in total control of HCLP and directed its operations. Once HEPPNER realized, in or about early 2019, that his control posed a problem for the audit and his fraud scheme, HEPPNER approached his childhood friend and asked him to serve as manager of HCLP. HEPPNER then created backdated paperwork that falsely represented that HEPPNER's friend had been acting as manager of HCLP since in or about July 2017. HEPPNER also created fake emails that appeared to have been exchanged between HEPPNER and his friend-turned-manager between September 2017 and December 2018, giving the false impression that the friend had been making decisions for HCLP and its related entities since 2017. And HEPPNER worked with others to draft a letter, which falsely asserted that the friend had independently supervised HCLP and its related entities since 2017.

19.   BRADLEY HEPPNER, the defendant, engaged in a similar series of lies to demonstrate the independence of another one of his associates. During the same week he created false documents concerning HCLP, HEPPNER directed an associate to prepare misleading letters and fraudulent emails for the auditor to make it appear that the associate acted independently of HEPPNER. In or about early February 2019, in coordination with HEPPNER, the associate created a backdated email and fake letter that appeared to substantiate that the associate had been conducting independent oversight of the Beneficient-associated trusts.

20.   BRADLEY HEPPNER, the defendant, directed Beneficient employees to send these false and misleading materials to the auditor. He also sent a signed representation letter to the auditor in which he falsely represented that he had no knowledge of fraud involving Beneficient management and that Beneficient had provided the auditor with all relevant information. The fraudulent materials were material to the auditor's accounting determinations that were incorporated in Beneficient's audit.

### Heppner Falsifies Records and Separates Himself from GWG

21.   In or about late 2020, GWG received a subpoena from the SEC in connection with the SEC's ongoing enforcement investigation of GWG and Beneficient. BRADLEY HEPPNER, the defendant, was aware of the SEC's subpoena and its investigation. As part of its investigation, the SEC requested information and documents concerning HCLP, including HEPPNER's relationship with HCLP and HCLP's use of funds.

22.   In or about spring 2021, as BRADLEY HEPPNER, the defendant, was separating himself from GWG, HEPPNER informed several Beneficient employees, for the first time, that he had received millions from debt repayment, which he characterized as "loans" from HCLP. To create the false impression that HEPPNER had previously disclosed to Beneficient his receipt of

10

"loans" from HCLP, in or about May 2021, HEPPNER falsified the minutes from an October 2019 Beneficient Board meeting. Specifically, HEPPNER added language to the minutes to make it appear that HEPPNER had disclosed to Beneficient his history of borrowing money from HCLP, and he then misled members of Beneficient's and GWG's Boards into approving those minutes as accurate. In truth, however, HEPPNER had never disclosed this information to the Beneficient board members in 2019, and the original version of the October 2019 Board meeting minutes did not include HEPPNER's added language. HEPPNER later caused the falsified Board minutes to be sent to the SEC.

23. In or about June 2021, BRADLEY HEPPNER, the defendant, resigned his position on GWG's Board. And, by the end of 2021, HEPPNER succeeded in separating Beneficient from GWG.

## Statutory Allegations

24. From at least in or about 2018 through at least in or about 2021, in the Southern District of New York and elsewhere, BRADLEY HEPPNER, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, HEPPNER engaged in a scheme to defraud GWG into transferring funds to

11

Beneficient, in exchange for the purchase of Beneficient's securities, by making misrepresentations and omissions about the origins of the Beneficient debt, the extent to which HEPPNER would benefit from repayments on the debt, and the extent to which HEPPNER directed entities that controlled the debt, including HCLP, and caused others to do the same.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

25. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

26. From at least in or about 2018 through at least in or about 2021, in the Southern District of New York and elsewhere, BRADLEY HEPPNER, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, HEPPNER, using email among other wire communications, engaged in a scheme to defraud GWG and prospective investors in Beneficient about the origins of the Beneficient debt, the extent to which HEPPNER would benefit from repayments on the debt, and the extent to which HEPPNER directed entities that controlled the debt, including HCLP, and caused others to do the same.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Conspiracy to Commit Securities Fraud and Wire Fraud)

The Grand Jury further charges:

27. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

28. From at least in or about 2018 through at least in or about 2021, in the Southern District of New York and elsewhere, BRADLEY HEPPNER, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and wire fraud, in violation of Title 18, United States Code, Section 1343.

29. It was a part and an object of the conspiracy that BRADLEY HEPPNER, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

30. It was further a part and an object of the conspiracy that BRADLEY HEPPNER,

13

the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Overt Acts

31. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a. In or about May 2019, BRADLEY HEPPNER, the defendant, caused false representations to be made to GWG's special committee and its representatives.

   b. In or about November 2019, HEPPNER caused false representations to be made to GWG's special committee and its representatives.

   c. In or about December 2019, HEPPNER caused false representations to be made to GWG's special committee and its representatives.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
### (False Statements to Auditors)

The Grand Jury further charges:

32. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

33. In or about 2019, in the Southern District of New York and elsewhere, BRADLEY HEPPNER, the defendant, willfully and knowingly, being a director and an officer of an issuer under the Securities and Exchange Act of 1934, directly and indirectly (a) made, and caused to be

made, a materially false and misleading statement to an accountant, and (b) omitted to state, and caused another person to omit to state, a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant, in connection with an audit, review and examination of the financial statements of the issuer required to be made and the preparation and filing of a document and report required to be filed with the SEC, to wit, HEPPNER made, and caused others to make, affirmative misrepresentations to Beneficient's auditor, including through the use of falsified and backdated documents, during the course of an audit of GWG and Beneficient.

(Title 15, United States Code, Section 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2(a); and Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Falsification of Records)

The Grand Jury further charges:

34. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

35. In or about May 2021, in the Southern District of New York and elsewhere, BRADLEY HEPPNER, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, and in relation to and in contemplation of such a matter, to wit, HEPPNER falsified Board minutes from October 2019 and misled members of Beneficient's and GWG's Boards into approving those minutes as accurate, with the intent to impede, obstruct, and influence an investigation by the SEC.

(Title 18, United States Code, Sections 1519 and 2.)

## FORFEITURE ALLEGATIONS

36. As a result of committing the offenses charged in Counts One through Four of this Indictment, BRADLEY HEPPNER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained and the following specific property:

   a. A residential property located at 6700 Turtle Creek Boulevard, Dallas, Texas 75205, and all fixtures, improvements, and furniture located at the property; and

   b. The property located at 588 AN Country Road 488, Montalba, Texas 75853 and known as "Bradley Oaks Ranch."

### Substitute Assets

37. If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

16

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

                        (Title 18, United States Code, Section 981(a)(c);
                        Title 21, United States Code, Section 853(p);
                        Title 28, United States Code, Section 2461.)

_____  
FOREPERSON

_____  
JAY CLAYTON  
United States Attorney