UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ UNITED STATES OF AMERICA,            │
│                                      │
│     -v-                              │
│                                      │
│ BRADLEY HEPPNER,                     │
│                                      │
│            Defendant.                │
└─────────────────────────────────────┘
```

25 Cr. 503 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

On March 26, 2026, the Court issued a "bottom-line" Order denying the motions of defendant Bradley Heppner to strike certain paragraphs from the indictment in this case and to dismiss each count of the indictment for one or more reasons. ECF No. 40. This Opinion sets forth the reasons for the Court's decisions.

I.    Background and Procedural History

On October 28, 2025, a grand jury in this District returned an indictment charging Heppner with securities fraud (Count One), wire fraud (Count Two), conspiracy to commit securities fraud and wire fraud (Count Three), making false statements to auditors (Count Four), and falsifying corporate records (Count Five). ECF No. 3 ("Indictment"). The indictment was unsealed on November 4, 2025, see ECF No. 4, and Heppner was arrested the following day. Trial is firmly set to commence on April 21, 2026. See ECF No. 36 at 9.

The charges against Heppner arise from his alleged misconduct as an executive of several corporate entities, including the publicly traded company GWG Holdings, Inc. ("GWG"). See generally Indictment. At a high level, the indictment charges that Heppner defrauded GWG's

1

investors of more than $150 million by making false representations about, and causing GWG to enter into undisclosed self-serving transactions involving, two privately held companies that Heppner controlled, Beneficient Company Group, L.P. ("Beneficient") and Highland Consolidated L.P. ("HCLP"). See id. ¶¶ 1-3.

On November 10, 2025, Heppner pleaded not guilty before this Court to all the charges against him and was released on bond. See ECF Nos. 16, 18. On February 6, 2026, Heppner filed the instant motions. ECF Nos. 24, 25 ("Def. Mem."). At a pretrial conference held on February 10, 2026, the Court ordered the Government to respond to Heppner's motions, which the Government did on February 24, 2026. ECF No. 29 ("Gov't Mem."). Heppner filed his reply on March 3, 2026, ECF No. 35 ("Reply"), and the Court held oral argument on March 19, 2026. At oral argument, the Court denied as moot Heppner's motion to strike certain paragraphs from the indictment, see ECF No. 38 at 2, and the Court also denied from the bench Heppner's motion to dismiss Count Two for failure to state a charge, see id. at 14. The Court reserved judgment on Heppner's remaining motions, see generally id., and the Court's bottom-line Order issued on March 26, 2026, ECF No. 40.

## II.  Motion to Strike Paragraphs from the Indictment

Heppner's first motion requests that the Court strike paragraphs 3, 4, 10, 11, 13(a), and 15 from the indictment. Invoking Federal Rule of Criminal Procedure 7(d), Heppner contends that these allegations are irrelevant or immaterial but highly prejudicial. See Def. Mem. at 2-9. Broadly speaking, the challenged paragraphs concern three

2

subjects: (1) references to GWG's bankruptcy and the losses that its investors sustained; (2) Heppner's alleged attempts to defraud two investors who decided not to invest in Beneficient; and (3) a loan that GWG made to Beneficient in or around May 2019. See id. at 4-9.

At the pretrial conference held on February 10, 2026, the Court suggested that this motion was moot because the Court's practice in every criminal case is not to present the indictment to the jury. See ECF No. 30 at 6-7. Heppner's counsel responded by indicating that the arguments in this motion "are probably better framed as motions in limine," id. at 7, and Heppner formally acknowledged in his reply papers that the motion is moot, see Reply at 2. Accordingly, the Court denied the motion as moot, without prejudice to Heppner's challenging the Government's introducing evidence in support of the relevant paragraphs of the indictment by making motions in limine or by objecting at the time that the Government offers such evidence at trial.

III. Motion to Dismiss Counts One, Two, and Three as Duplicitous of Counts Four and Five

In his second motion, Heppner contends that the indictment wrongly incorporates into Counts One, Two, and Three certain factual allegations that pertain only to Counts Four and Five. Def. Mem. at 9-14. The allegations at issue concern Heppner's alleged misrepresentations to Beneficient's auditors and Heppner's alleged falsification of Beneficient's board minutes. See Indictment ¶¶ 16-20 (pertaining primarily to Count Four), ¶¶ 21-23 (pertaining primarily

3

to Count Five). In Heppner's view, the incorporation of these allegations into Counts One, Two, and Three could result in the jury convicting him of any or all of those counts based solely on conduct that pertains instead to Count Four or Count Five, in which case the counts are duplicitous. Def Mem. at 12-14. Further, Heppner hypothesizes that the jury could convict him of any of the first three counts without reaching unanimity as to what conduct constituted the crime of conviction, id. at 12-13, and that he could face double jeopardy if the jury acquits him on any of Counts One, Two, or Three because it would be impossible to determine what conduct the jury concluded he did not engage in, id. at 13-14. The Government responds that the indictment is satisfactory because, among other things, an indictment is not duplicitous where proof of certain crimes could include conduct that is also charged as one or more separate crimes. Gov't Mem. at 16-18.

An indictment "is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count . . . and 2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001).[1] That is not the case here. The conduct charged as independent crimes in Counts Four and Five may, but need not, have formed part of the schemes and conspiracies charged in Counts One, Two, and Three. As the Court observed at oral argument, that conduct

---

[1] Except where otherwise indicated, all quotations in this Opinion omit citations, internal quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

would constitute part of the schemes and conspiracies to the extent that it was contemplated as part of them, rather than being an attempt to conceal them. See ECF No. 38 at 10-12. But the conduct charged in Counts Four and Five could not, on its own, constitute any of the crimes charged in Counts One, Two, and Three, which require additional elements, so there is no danger that two or more distinct crimes are combined into any of those counts. To avoid any confusion, however, the Court will, after receiving the evidence presented at trial and after giving the parties an opportunity to be heard at the charging conference, instruct the jury as to whether the conduct charged in Counts Four and/or Five could be considered by them as evidence of the schemes and conspiracies that are charged in Counts One, Two, and Three.

Accordingly, the Court denied Heppner's motion to dismiss Counts One, Two, and Three as duplicitous of Counts Four and Five.

IV.  Motion to Dismiss Count Two

Next, Heppner moves under Federal Rule of Criminal Procedure 12(b)(3) to dismiss Count Two, the wire fraud charge, on the basis that the indictment fails to state an offense. Def. Mem. at 14-20. Here, Heppner argues that the misrepresentations he is alleged to have made are not material, as a matter of law, for purposes of the federal wire fraud statute, 18 U.S.C. § 1343. In Heppner's view, the alleged misrepresentations concern "what would happen to funds after they flowed through Beneficient to its creditor," and do not concern "the terms of the equity investments" themselves. Def. Mem. at 16; see also

Reply at 4-7. Heppner characterizes the alleged misrepresentations, which had to do with such matters as the origins of Beneficient's debt, Heppner's capacity to benefit from payments on that debt, and the extent of Heppner's control over HCLP, as mere "negotiating positions." See Def. Mem. at 16-17. Because the alleged misrepresentations are immaterial as a matter of law, Heppner contends, Count Two fails to state an offense even if the Government were able to prove all the indictment's factual allegations.

In making this argument, Heppner relies primarily on United States v. Weimert, 819 F.3d 351 (7th Cir. 2016); see Def. Mem. at 14-20. In that case, the Seventh Circuit decided that, in certain circumstances, a defendant's misrepresentations about so-called "negotiating positions" can be immaterial as a matter of law. Weimert concerned a bank vice president who, being called upon to close a transaction that would effectively save the bank from failure, misled "the successful buyer to believe the seller wanted him to have a piece of the deal" and misled "the seller to believe the buyer insisted he have a piece of the deal." 819 F.3d at 354. The Seventh Circuit concluded that, because there was "no evidence that Weimert misled anyone about any material facts or about promises of future actions," Weimert's conduct did not constitute wire fraud. Id. The court implied, however, that it would have been different had Weimert's misrepresentations "materially alter[ed] one party's understanding of the subject of the deal." Id. at 356. Heppner argues that the alleged misrepresentations

charged in Count Two are analogous to those in _Weimert_ and that, accordingly, Count Two must be dismissed.

Since _Weimert_ is a case from the Seventh Circuit that has not been adopted by the Second Circuit, this Court is not bound by _Weimert_.[2] But even assuming that _Weimert_'s reasoning were to be accepted in the Second Circuit, _Weimert_ is significantly distinguishable from this case. Based on the evidence that the Government expects to introduce at trial, a reasonable jury could conclude that Heppner's alleged misrepresentations were material to the members of the GWG special committee who approved investments in Beneficient. That is, in _Weimert_'s terms, those alleged misrepresentations -- which concerned how Beneficient came to be indebted to HCLP, whether Heppner stood to

---

[2] Heppner makes no argument that the Second Circuit has adopted _Weimert_ or its reasoning. However, while the Government contends that Supreme Court and Second Circuit precedent are "inconsistent" with _Weimert_, Gov't Mem. at 21, that characterization strains each of the cases on which the Government relies. In _United States v. Litvak_, the Second Circuit initially rejected the argument that misrepresentations are immaterial, as a matter of law, when they do not relate to the "value" of a security. 808 F.3d 160, 175-78 (2d Cir. 2015). Litvak advanced the same argument on his second appeal, and the Second Circuit again rejected it. 889 F.3d 56, 67 (2d Cir. 2018). The Circuit reasoned that even though "statements about the price paid . . . are not intended, or understood, as relevant to the intrinsic value" of a security, that does not mean that "such assertions are not material as a matter of law." _Id._ The _Litvak_ decisions concerned only the value and price of a security, so they shed no meaningful light on whether the Second Circuit would adopt _Weimert_'s rule as to misrepresentations regarding other matters. Then, the Government cites _Kousisis v. United States_, 605 U.S. 114, 118 (2025), for the proposition that a fraud charge lies "whenever" a defendant "uses a material misstatement to trick a victim into a contract that requires handing over her money or property," even where the representation relates neither to value nor to price. _Kousisis_ does not, however, purport to address whether misrepresentations about so-called "negotiating positions" are, or ever can be, material. _See_ Reply at 4-5.

benefit from payments on Beneficient's debt, and what degree of control, if any, Heppner exercised over HCLP -- may well have "materially altered" the GWG special committee's "understanding of" the transactions they were asked to approve. See id. That GWG's board was already aware of the potential for conflicts of interest involving Heppner is patent from the fact that the board established a committee of disinterested directors to approve transactions involving GWG and Beneficient. Accordingly, the Court cannot conclude, as a matter of law, that the alleged misrepresentations were immaterial.

Moreover, the Seventh Circuit has itself cabined the holding of Weimert. Most recently, in United States v. Courtright, 155 F.4th 941, 949 (7th Cir. 2025), the Seventh Circuit characterized Weimert's rule as narrow, writing that Weimert "merely stands for the proposition that, while sophisticated businesspeople are expected to hide their true goals, values, priorities, or reserve prices from their negotiating partners, they are not permitted to obfuscate material information." Indeed, in Courtright, the Seventh Circuit concluded that information about a company's "financial condition" and its adherence to its operating procedures were both "highly material." See id. And even earlier, in United States v. Filer, 56 F.4th 421, 430-31 (7th Cir. 2022), the Seventh Circuit distinguished Weimert when it reversed a judgment of acquittal, holding that a rational jury could conclude that a defendant's concealment of the identities and relationships of parties to a transaction was material. Were this Court obliged to apply Seventh Circuit law, it would conclude that the

allegations against Heppner are analogous to those in Filer because the indictment here charges Heppner with making affirmative misrepresentations about, among other things, his control of Beneficient's creditor, HCLP. See Gov't Mem. at 20. A jury could therefore reasonably conclude that Heppner's misrepresentations would have been material in the eyes of GWG's special committee.

Accordingly, because Weimert is both factually and legally distinguishable and because materiality is, at its heart, a question of fact for the jury, the Court denied Heppner's motion to dismiss Count Two.

V.    Motion to Dismiss Count Four

In his next motion, Heppner contends that the Court should dismiss Count Four, the charge of making false statements to auditors in violation of 18 U.S.C. § 78ff(a) and 17 C.F.R. § 240.13b2-2(a), for two independent reasons. First, Heppner argues that this charge is time-barred because the five-year statute of limitations that Heppner contends is applicable to Count Four ran in June 2024. Second, Heppner asserts that Count Four fails to state an offense because he was not a "director or officer of an issuer" of securities during most of the relevant period of time and because the only documents that Heppner supplied while serving as a director or officer of an issuer were not "required to be filed" with the Securities and Exchange Commission. Both of these arguments appear to present issues of first impression, at least in this Circuit. For the following reasons, the Court has concluded that neither argument is meritorious.

9

A.    Statute of Limitations

The generic statute of limitations for federal crimes is five years. See 18 U.S.C. § 3282. There is a six-year statute of limitations, however, for any "securities fraud offense," as defined in 18 U.S.C. § 3301. That section, enacted in 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, provides that "the term 'securities fraud offense' means a violation of, or a conspiracy or an attempt to violate," certain enumerated statutes, including "section 32(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78ff(a))." 18 U.S.C. § 3301(a)(2). Section 78ff(a) makes it a crime to "willfully violate[] any provision of [the Securities Exchange Act] . . . , or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter." 15 U.S.C. § 78ff(a). Count Four charges Heppner with violating Section 78ff(a) by violating 17 C.F.R. § 240.13b2-2(a) ("Rule 13b2-2"), a regulation promulgated under the Securities Exchange Act that, among other things, prohibits any "director or officer of an issuer" from "mak[ing] or caus[ing] to be made a materially false or misleading statement to an accountant in connection with" or "omit[ting] to state, or caus[ing] another person to omit to state, any material fact . . . to an accountant in connection with" either "[a]ny audit, review[,] or examination of the financial statements of the issuer required to be made pursuant to this subpart" or "[t]he preparation or filing of any

10

document or report required to be filed with the Commission pursuant to this subpart or otherwise." Id.

The question before the Court, then, is whether violating Section 78ff(a) by violating Rule 13b2-2 is a "securities fraud offense" subject to Section 3301's six-year statute of limitations. Based on the text and congressional purpose of Section 3301, the answer is yes.

"Statutory definitions control the meaning of statutory words," absent indications to the contrary. See Burgess v. United States, 553 U.S. 124, 129-30 (2008). Here, Section 3301 expressly defines the term "securities fraud offense" to include "a violation of, or a conspiracy or an attempt to violate," among other statutes, Section 78ff(a). 18 U.S.C. § 3301(a)(2). Heppner is correct that, as a matter of ordinary speech, not all violations of Section 78ff(a) are prototypical fraud offenses, that is, schemes involving the intent to fraudulently obtain money or property. Def. Mem. at 28-29; ECF No. 38 at 15-16. Here, for instance, Count Four charges Heppner with violating Section 78ff(a) by making false statements to auditors, which does not require, as an element, proof of fraudulent intent. But regardless of whether an ordinary speaker would call every violation of Section 78ff(a) a "securities fraud offense," that is exactly how Congress used the term. As Heppner's counsel conceded at oral argument, see ECF No. 38 at 17, where statutory language is unambiguous, the Court is bound to apply a statute as Congress drafted it.

Furthermore, even assuming (contrary to fact) any ambiguity, the fact that Congress intended what it wrote is confirmed by a review of

11

the legislative record. Congress enacted Section 3301's six-year limitations period in the wake of the financial crisis of 2008 and as part of a bill intended to "promote the financial stability of the United States" and to "protect consumers from abusive financial services practices." Pub. L. 111-203, preamble; 124 Stat. 1376, 1376. Extending the statute of limitations for the crimes that Congress dubbed "securities fraud offenses" was part and parcel of the Dodd-Frank Act's effort to strengthen the ability of federal prosecutors to bring cases alleging criminal violations of securities and commodities laws. The same section of the Dodd-Frank Act that is codified in Section 3301 also directs the United States Sentencing Commission to ensure that the penalties for "offenses relating to securities fraud or any other similar provision of law" take appropriate account of the "potential and actual harm to the public and the financial markets" caused by such offenses. See Pub. L. 111-203 § 1079A(a)(1)(A) (emphasis added). That section also includes a similar provision with regard to penalties for "fraud offenses relating to financial institutions or federally related mortgage loans and any other similar provisions of law." Id. § 1079A(a)(2)(A) (emphasis added). The broad language that Congress used in these provisions confirms that Congress meant what it said in the provision that is codified in Section 3301: that all violations of Section 78ff(a), not just those that might ordinarily be referred to in everyday speech as "securities fraud" offenses, are subject to a six-year statute of limitations.

Heppner's arguments to the contrary are unavailing. First, Heppner contends that Section 3301's title is "Securities fraud offenses" and that Section 3301 uses the term "securities fraud offense," so it must apply only to those offenses that sound in fraud. Def. Mem. at 28-29. But, as the Court has already indicated, Section 3301 unambiguously defines the term "securities fraud offense" to include all violations of Section 78ff(a). That not all violations of Section 78ff(a) sound in fraud is beside the point.

Second, Heppner argues that no court has decided whether Section 3301 extends the statute of limitations for an alleged criminal violation of Rule 13b2-2. Def Mem. at 29; Reply at 12. Heppner does not, however, point to any cases adopting his reading of the statute. The issue, as the parties appear to agree, is novel.[3]

Third, Heppner points to a purportedly slippery slope, arguing that, on the Government's reading, "every willful violation of any federal securities law, rule, or regulation" under various statutes "is a qualifying 'securities fraud offense'" that is subject to Section 3301's statute of limitations. Def. Mem. at 30; Reply at 12-13. Heppner maintains that "[t]his is not, and [cannot be,] the case." Id. But

_____

[3] Heppner observes, in passing, that the six-year statute of limitations has been found to apply to violations of Section 78ff(a) where the underlying conduct indisputably sounds in fraud, such as violations of 18 U.S.C. § 1348 (securities and commodities fraud), 17 C.F.R. § 240.10b-5 (employment of manipulative and deceptive devices), 15 U.S.C. § 80b-6 (fraudulent transactions by investment advisors), and 15 U.S.C. § 77q(a) (fraudulent interstate transactions). See Def. Mem. at 29-30. That does not, however, resolve either way the question before the Court, which is whether offenses that do not sound in fraud are also subject to Section 3301's extended statute of limitations.

Heppner's conclusory argument stands in stark contrast to the plain language of the statute that Congress enacted, as well, as mentioned, as the clear evidence of its intent reflected in the legislative history.

In that regard, finally, Heppner argues that the legislative history of the Dodd-Frank Act is "unenlightening" as to whether Congress intended Section 3301 to apply to all violations of Section 78ff(a). Reply at 13. But there is no doubt that Congress enacted the Dodd-Frank Act against the backdrop of what has almost uniformly been regarded as one of the great financial crises of recent decades. That Congress directed the Sentencing Commission to ensure that penalties for two broad sets of financial crimes were sufficiently serious and, in the very same section of the Dodd-Frank Act, chose to extend the statute of limitations for another broad set of financial crimes is far from meaningless. And, in any event, as the Court noted above, the text that Congress enacted is on its own so clear and unambiguous as to be sufficient to resolve this issue.

For all these reasons, the Court concludes that a six-year statute of limitations applies to Count Four. The conduct alleged in that count occurred in February and June of 2019. In December 2024, while the six-year statute of limitations was still running, Heppner and the Government entered into an agreement providing, in relevant part, that the statute of limitations would be tolled from December 20, 2024, through December 20, 2025. See ECF No. 25-2. Thus, when the indictment

14

in this case was filed on October 28, 2025, the statute of limitations had not yet run.

B.    Failure to State an Offense

Turning to the merits of Count Four, which alleges that Heppner made false statements to auditors in violation of Rule 13b2-2, Heppner argues that this count fails to state a charge. Def. Mem. at 20-26; Reply at 8-12. Heppner advances three reasons: (1) the indictment identifies only GWG, not Beneficient, as an "issuer" for purposes of Rule 13b2-2; (2) Beneficient is not, in any case, an "issuer" under Rule 13b2-2; and (3) even were Beneficient an issuer, none of the alleged false statements charged in Count Four fits Rule 13b2-2 because Beneficient was not required to file any document or report with the SEC. See ECF No. 38 at 32-33.[4] Each of Heppner's arguments fails.

1.    Definition of "Issuer"

The Court begins with Heppner's claim that Beneficient is not an "issuer" within the meaning of Rule 13b2-2. For this argument, Heppner relies upon the definition of "issuer" contained in the Sarbanes-Oxley

---

[4] The parties also argue over whether the Court may properly consider any of these arguments. The Government contends that Count Four is legally sufficient because it "tracks the language of Rule 13b2-2, and alleges a willful violation of those prohibitions, as required by Section 78ff." Gov't Mem. at 24-25. However, where a motion to dismiss for failure to state a charge is made "solely upon an issue of law, and not fact," a court may consider the merits so long as the relevant facts are undisputed. E.g., United States v. George, 223 F. Supp. 3d 159, 163 (S.D.N.Y. 2016). That situation obtains here: the parties agree that, in February 2019, when Heppner allegedly falsified certain documents, he was an officer or director of Beneficient, but not GWG, and that, in June 2019, when he allegedly signed a certification that he knew to be false, he was an officer or director of both Beneficient and GWG. See Def. Mem. at 1; ECF No. 38 at 31-32.

Act of 2002, Pub. L. 107-204, 116 Stat. 745. There, Congress defined "issuer" as "an issuer (as defined in [15 U.S.C. § 78c]), the securities of which are registered under section 78l of this title, or that is required to file reports under section 78o(d) of this title, or that files or has filed a registration statement that has not yet become effective under the Securities Act of 1933 . . . , and that it has not withdrawn." 15 U.S.C. § 7201(7). See Reply at 9-11. The Government responds that Rule 13b2-2 instead employs the definition of "issuer" in the Securities Exchange Act, 15 U.S.C. § 78c, which is substantially broader: in that statute, "'issuer' means any person who issues or proposes to issue any security," subject to certain exceptions not relevant here. See 15 U.S.C. § 78c(a)(8); Gov't Mem. at 25. Because the parties agree that Beneficient does not meet the Sarbanes-Oxley Act's definition of "issuer" but fits the Securities Exchange Act's definition of "issuer," the question before the Court is which definition applies.

The SEC revised Rule 13b2-2 to its present form some months after Congress enacted the Sarbanes-Oxley Act. See Improper Influence on Conduct of Audits, Securities Exchange Act Release 26,050, 80 SEC Docket 770 (May 20, 2003), at *1. In doing so, the SEC "redesignat[ed]" the former Rule 13b2-2 as the present Rule 13b2-2(a) and "add[ed] new [R]ules 13b2-2(b) and (c)." Id. In proposing these amendments, the SEC expressly noted that the Securities Exchange Act's definition of "issuer" would apply to the redesignated and new rules, as it did to the former Rule 13b2-2. See id. at *2. In response to a public comment

proposing that the SEC instead employ the Sarbanes-Oxley Act's definition of "issuer," the SEC explained that "[w]e continue to believe that the definition of the term 'issuer' in section 3 of the [Securities Exchange Act, i.e., 15 U.S.C. § 78c(a)(8)] applies to the use of the term in the new rules" because, among other things, the Sarbanes-Oxley Act is not the sole source of the SEC's authority to make rules regarding illegal acts that concern the "issuance of false or misleading audit reports." See id. at *2 & n.10. Moreover, to the extent that the commenter was concerned that employing the Securities Exchange Act's definition of "issuer" would impose obligations on all private issuers of securities, the SEC responded that all three subparts of Rule 13b2-2 do not apply to documents or reports that are not "required to be filed" with the Commission. Id. at *2. While the SEC's analysis is not binding on this Court and may no longer be owed deference in light of the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), the Court finds it persuasive under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

Heppner presents few arguments distinct from those that the SEC considered and rejected in 2003. See Reply at 9-11 (relying primarily on Exchange Act Release 26,050). Notably, he points to no court that has interpreted Rule 13b2-2 as he proposes. And his sole remaining argument -- which is that failing to limit Rule 13b2-2 to the issuers defined in the Sarbanes-Oxley Act would risk imposing criminal liability on millions of small businesses that are not regulated by the SEC -- sounds in policy rather than statutory interpretation.

17

Reply at 10. Moreover, Heppner's policy-based argument rests on an incorrect premise: even under the Securities Exchange Act's definition, liability under Rule 13b2-2 only attaches where a materially false or misleading statement is made "in connection with" an "audit, review[,] or examination . . . required to be made" or a "document or report required to be filed with the Commission." 17 C.F.R. § 240.13b2-2(a)(1)(i)-(ii); see also id. § 240.13b2-2(b)(1) (limiting liability to circumstances involving any "audit or review of the financial statements . . . that are required to be filed with the Commission"); id. § 240.13b2-2(c)(1)(ii)(A)-(B), (2) (similar).

Accordingly, the Court has concluded that the Securities Exchange Act's definition of "issuer" governs Rule 13b2-2(a).

###### 2.    Beneficient as Issuer

Because Heppner does not dispute that both GWG and Beneficient are issuers under the Securities Exchange Act's definition, the Court turns to Heppner's next argument, which is that the indictment identifies only GWG, but not Beneficient, "as the public company required to file with the SEC." Reply at 9. To treat Beneficient as an issuer for purposes of Count Four, Heppner reasons, would be an impermissible constructive amendment of the indictment. Id. at 8-9 (citing Stirone v. United States, 361 U.S. 212, 215-16 (1960)). But this argument fails because Rule 13b2-2 governs the conduct of the officers or directors of any issuer in connection with the preparation or filing of a required document.

18

Specifically, the indictment alleges that "Beneficient's audit was required to be incorporated in GWG's 2018 annual SEC filing" and that Heppner "made false and misleading statements and prepared false documents to deceive" the independent auditor whom Beneficient retained. Indictment ¶ 17; see also id. ¶¶ 18-19 (describing specific alleged falsifications). Then, the indictment alleges that Heppner "directed Beneficient employees to send these false and misleading materials to the auditor" and that Heppner himself "sent a signed representation letter to the auditor in which he falsely represented that he had no knowledge of fraud involving Beneficient management and that Beneficient had provided the auditor with all relevant information." Id. ¶ 20. All of these are plainly references to Beneficient's auditor, not GWG's auditor. Because the indictment alleges that Beneficient's audit was required to be filed with the SEC, albeit as part of a filing by GWG, id. ¶ 17, it follows that the alleged misrepresentations to Beneficient's auditor that are charged in Count Four constituted "materially false or misleading statement[s]" by Heppner, in his capacity as an officer or director of Beneficient, "in connection with . . . [t]he preparation or filing of any document or report required to be filed with the Commission," 17 C.F.R. § 240.13b2-2(a)(1)(ii). Accordingly, the Court has concluded that the Government has not constructively amended the indictment and that the indictment refers to both GWG and Beneficient as issuers.[5]

_____

[5] Heppner separately argues that the indictment's allegation concerning the false representation letter that he sent in June 2019, ¶ 20, does

19

3.    Filing Requirements

Heppner's final argument, which he asserts only in his reply brief, is that Beneficient was not required to (and did not) file anything with the SEC and that the indictment improperly conflates Beneficient's obligations with GWG's. Reply at 11-12. It is well established that arguments raised for the first time on reply need not be considered, although the Court may choose to consider such arguments in its discretion. E.g., Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co., 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009). The Court exercises its discretion to consider Heppner's argument but finds it unavailing.

Heppner's argument is, fundamentally, conclusory. The indictment alleges that GWG's auditor determined that Beneficient's audit "was required to be incorporated into" a filing that, as Heppner does not dispute, GWG was obligated to submit to the SEC. See Indictment ¶ 17; Reply at 11-12. If GWG's auditor was correct, as the indictment's allegations presuppose, then Beneficient's audit was a "document or report required to be filed" with the SEC. See 17 U.S.C. § 240.13b2-2(a)(1)(ii). Rule 13b2-2(a) does not distinguish between documents

---

not fit within Count Four's "statutory allegation" that he violated Rule 13b2-2(a) by using "falsified and backdated documents," ¶ 33. See Def. Mem. at 25-26; Reply at 8. But this argument, which Heppner appeared to abandon at oral argument, mischaracterizes the indictment. The "to-wit" clause of Count Four charges that Heppner "made, and caused others to make, affirmative misrepresentations to Beneficient's auditor, including through the use of falsified or backdated documents." Indictment ¶ 33 (emphasis added). Making an affirmative misrepresentation by knowingly signing a false representation letter and transmitting it to Beneficient's auditor, which is precisely what the indictment alleges in its speaking allegations, clearly fits within this language.

that an issuer must file with the SEC itself and documents that may or must be filed by others. See id.

Notably, Heppner does not argue that GWG's auditor was incorrect that Beneficient's audit needed to be incorporated into GWG's filing. Although he is free to offer evidence to that effect at trial, he has made no showing, at this stage, that the indictment's allegations are contrary to law. See George, 223 F. Supp. 3d at 163.

In sum, the Court has concluded that Beneficient is an "issuer" for purposes of Rule 13b2-2; that the indictment alleges that both Beneficient and GWG were issuers as to which Heppner served, during the relevant period, as an officer or director; and that the indictment alleges that Beneficient's audit was a document required to be filed with the SEC. It was for these reasons that the Court denied Heppner's motion to dismiss Count Four.

## VI.  Motion to Dismiss Count Five

Heppner's final motion seeks the dismissal of Count Five, which charges him with falsifying board minutes from October 2019 and misleading members of Beneficient's and GWG's boards into approving the falsified minutes as accurate. See Indictment ¶ 35. The indictment alleges that Heppner did so "with the intent to impede, obstruct, and influence an investigation by the SEC," in violation of 18 U.S.C. § 1519. Id. Heppner contends that the indictment does not adequately allege venue for this count in the Southern District of New York. Def. Mem. at 31-35; Reply at 14-17.

21

At the threshold, the Court addresses the Government's argument that the indictment sufficiently alleges venue because Count Five states on its face that the offense occurred "in the Southern District of New York." Gov't Mem. at 32. But while it is generally true that an indictment that meets "the basic pleading requirements and [is] valid on its face" is enough to withstand a motion to dismiss for insufficiency of evidence, that is not the case when "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." See United States v. Perez, 575 F.3d 164, 166-67 (2d Cir. 2009). Here, the Government asserted in its opposition papers only three circumstances that could conceivably establish venue for Count Five in this District: first, that Heppner emailed the allegedly falsified minutes to a Beneficient board member located in Connecticut, in order to induce a Beneficient board committee on which that member sat to approve the minutes as genuine; second, that Heppner caused the allegedly falsified minutes to be approved by Beneficient's full board at a meeting that one board member attended remotely from Manhattan; and third, that Heppner's attorneys, based in Manhattan, transmitted the allegedly falsified minutes to the SEC. See Gov't Mem. at 32-33. At oral argument, the Government did not point to any other evidence that could potentially establish venue for Count Five. See ECF No. 38 at 23-25.

Accordingly, the Court turns to the merits of Heppner's challenge to Count Five, which is that venue for the conduct charged in that count lies in Texas, where Beneficient's board meeting chiefly occurred

22

and where Heppner was located when he sent an email allegedly in order to further the falsification of the minutes. See Def. Mem. at 31. Even were the venue inquiry to extend to the location of the SEC investigation that Heppner allegedly sought to obstruct, he reasons, that investigation was based out of the SEC's regional office in Chicago, which (as the Government does not dispute) does not have jurisdiction over New York. Id. at 31-32. Thus, according to Heppner, venue for Count Five is improper in this District because venue lies, at most, in "the district where the defendant falsified the document" and in "the district where the allegedly obstructed investigation was pending." Reply at 14-15 (collecting cases).[6]

Heppner might be correct if the indictment charged him simply with falsifying the board minutes at issue. However, it charges more, alleging that he also "misled members of Beneficient's and GWG's Boards into approving those minutes as accurate," and that he engaged in this entire course of conduct with the intent to obstruct the SEC's investigation. Indictment ¶ 35. Accordingly, in order to complete the charged crime, Heppner did not just generate the falsified minutes but also had them approved. Indeed, had board approval not occurred,

---

[6] Heppner adds that, in his view, the Supreme Court is likely to narrow the law of venue for purposes of Section 1519 because, earlier this year, the Court granted a writ of certiorari to review a decision of the Ninth Circuit that held that venue is proper in the district where an allegedly obstructed federal investigation is taking place. See Reply at 14-16; United States v. Abouammo, 122 F.4th 1072, 1089-96 (9th Cir. 2024), cert. granted, 146 S. Ct. 878 (2025). Whether Heppner's prediction is accurate is, however, beside the point. The Government does not rely on the location of the allegedly obstructed investigation as a basis for venue.

Heppner would not have completed the act of knowingly "falsif[ying]" or "mak[ing] a false entry" in Beneficient's minutes, see 18 U.S.C. § 1519, because the documents comprising those minutes are, by definition, the documents that have received board approval. And while board approval need not have occurred in this District, the Government alleges that it did occur here, at least in part, because one of Beneficient's board members allegedly attended the meeting at which the falsified minutes were approved from Manhattan.

It is well established, in the Second Circuit, that venue is proper in a district where, among other things, "the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur." E.g., United States v. Royer, 549 F.3d 886, 894 (2d Cir. 2008). Likewise, "[r]eceipt of electronic transmissions in a district is sufficient to establish venue activity there." Id. at 895. Here, the indictment alleges that it was not just in furtherance of, but in fact essential to, the crime charged in Count Five that Beneficient's board approve the falsified minutes and that Heppner intentionally caused the board to do so; all that conduct was, the indictment alleges, prerequisite to Heppner's deception of the SEC. See Indictment ¶ 35. Heppner does not dispute that one of the board members who attended the crucial meeting did so by means of electronic transmissions sent to and received from this District.

Accordingly, the Court denied Heppner's motion to dismiss Count Five because the Government has adequately alleged venue for that count.[7]

VII. Conclusion

For the foregoing reasons, the Court's "bottom-line" Order of March 26, 2026, denied each of Heppner's pre-trial motions.

New York, NY
April 6, 2026

JED S. RAKOFF, U.S.D.J.

---

[7] Because the Court concluded that this conduct suffices to establish venue for Count Five, it need not (and did not) reach the Government's alternative arguments that venue for Count Five also lies in this District because Heppner's lawyers transmitted the allegedly falsified minutes, along with communications about them, to the SEC from offices located in this District and because the allegedly falsified minutes passed electronically through this District on their way to a board committee member located in Connecticut. The Court regards the former basis for venue as sturdier than the latter. "[C]ourts in this Circuit have found venue to be proper where a jury could reasonably conclude that the emails in question were sent or received in the relevant district." E.g., United States v. Griffith, No. 20 Cr. 15, 2020 WL 4369540, at *2 (S.D.N.Y. July 29, 2020) (collecting cases).